**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

CARMEN ELIZABETH MARRERO
HERNANDEZ, et al.,

      Plaintiffs,

        v.                                    **CIVIL NO. 03-1485 (GAG)**

ESSO STANDARD OIL CO. (PUERTO
RICO), et al.,

      Defendants.

## OPINION AND ORDER

Plaintiffs, past and present property owners and residents of La Vega Ward, Barranquitas, Puerto Rico, bring this action against Esso Standard Oil Co. (Puerto Rico) ("Esso") and others alleging violations of state and federal environmental laws. Esso has moved for summary judgment as to plaintiffs' federal claims under the Clean Water Act, 33 U.S.C. §§ 1251 et seq. ("CWA"), the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq. ("RCRA"), and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq ("CERCLA"). For the reasons stated herein, the court **DENIES** Esso's motion for summary judgment (Docket No. 905).

## I.    Standard of Review

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law'." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-

Civil No. 03-1485 (GAG)                    2

1   moving party's case. Celotex, 477 U.S. at 325.  The nonmoving party must then "set forth specific

2   facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  If the court finds that

3   some genuine factual issue remains, the resolution of which could affect the outcome of the case,

4   then the court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

5   248 (1986).

6        When considering a motion for summary judgment, the court must view the evidence in the

7   light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of

8   any and all reasonable inferences.  Id. at 255.  Moreover, at the summary judgment stage, the court

9   does not make credibility determinations or weigh the evidence.  Id.  Summary judgment may be

10  appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations,

11  improbable inferences, and unsupported speculation."   Forestier Fradera v. Municipality of

12  Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166,

13  173 (1st Cir. 2003)).

14  **II.     Relevant Material Facts and Procedural Background**

15       Consistent with the summary judgment standard, the court states the facts in the light most

16  favorable to plaintiffs.  See Iverson, 452 F.3d at 98.  Additionally, in accordance with Local Rule

17  56, the court credits only facts properly supported by accurate record citations.  See D.P.R. L.Civ.R

18  56(e).  The court has disregarded all argument, conclusory allegations, speculation, and improbable

19  inferences disguised as facts.  See Forestier Fradera, 440 F.3d at 21; Medina-Muñoz v. R.J. Reynolds

20  Tabacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

21       Esso owned and operated a service station in La Vega for over fifty years, from the facility's

22  construction in the 1940s until it ceased its operations in 1998.  During the station's operation, Esso

23  installed four underground storage tanks ("USTs") to store and dispense gasoline and diesel fuel.

24  Esso owned these USTs together with the piping thereto and supplied gasoline, diesel, and other

25  products to the operators of the station.  For sometime before December 1991 the USTs had been

26  releasing their contents into the facility's soil and groundwater.  Other releases occured over time

27  associated with the operation of the service station.  The substances released included gasoline with

28  BTEX components, diesel fuel, batteries, oil filters, and used oil.  The releases to the environment

1  caused contamination of the groundwater and soils within the footprint of the former station site and
2  some of the contamination has migrated beyond that footprint.

3          Co-defendant Carlos Rodríguez ("Rodríguez"), lessee of Esso's USTs and operator of the
4  station up to the time it ceased operations, complained on several occassions of product loss from
5  the station.  In 1991, Esso replaced the three USTs at the station, which, when removed, revealed
6  signs of corrosion and perforations.  Field screening results indicated the presence of aromatic
7  hydrocarbons in the subsoil and in the excavated soil from the tank pits.  According to the Puerto
8  Rico Environmental Quality Board ("EQB") in 1989 the station was placed on the Leaking
9  Underground Storage Tanks list ("LUST list").  Esso installed a monitoring well for the groundwater
10 below the station to detect discharges from its USTs.  The EQB reports that in April 1990 a broken
11 diesel line was reported at the station and a month later the monitoring wells evinced the presence
12 of hydrocarbons.  Additional monitoring wells were installed at the station, which over the course
13 of eighteen months, from May 1990 to November 1991, showed the presence of free petroleum
14 products in the subsoil and groundwater.  The gasoline had seeped through the soil, formed a plume
15 in the groundwater and spread.  According to the EQB, Esso never preformed the necessary tests to
16 verify the integrity of the USTs, it never quantified the amount of product spilled, nor did it
17 determine the vertical and horizontal extensions of the contamination.  When in 1994 the EQB
18 required Esso to submit technical reports as part of the Underground Storage Tank Control Program
19 ("USTCP") describing the station's situation subsequent to the 1990 leak, Esso personnel complied,
20 but indicating that only 1.6 gallons of free product had been recovered in 1991.  After the USTCP
21 studied the reports submitted by Esso, the EQB issued an order requiring Esso to carry out studies
22 to determine the vertical and horizontal extent of the free or dissolved product in the affected area,
23 in order to assess the magnitude of the leak and contamination.  The EQB reports that Esso again
24 failed to adequately comply with the order.

25         Rodríguez continued to operate the station with the new tank system until 1998, when the
26 Puerto Rico authorities ordered the station closed due to detected hydrocarbon odors.  Between
27 August 1998 and October 1999, the EQB issued three orders directing Esso to test the fuel storage
28 system.  These investigations revealed BTEX concetrations in various soil samples that ranged from

0.32 to 77.5 mg/kg; TPH (gasoline range) concentrations ranging from 24 to 5,200 mg/kg; and total lead results from non-detectable to 31.6 mg/kg. On-site contamination was detected in soil samples at depths just below the groundwater table, while off-site results showed detectable levels of petroleum hydrocarbons in some areas, primarily at the regional water table depth. Esso was ordered to characterize the plume, conduct geophysical tests, create a barrier between the station and the adjacent Piñonas River, and to submit a remediation plan for the contamination.

On May 21, 2001 the EQB issued a show cause order proposing a $76 million fine against Esso for its failure to notify the EQB upon initial discovery of the fuel leakage and its failure to timely investigate and remedy the harm. The EQB also required Esso to submit a corrective action or remediation plan. In September of 2002, the EQB initiated hearings on the proposed penalty and, after contentious debates and allegations of severe bias, Esso filed suit in federal court seeking a preliminary injunction to prevent the EQB from imposing the fine, on the ground that the proceedings were so plagued by conflict and bias that they violated Esso's due process rights. See Esso Standard Oil Co. v. Cotto, 389 F.3d 212 (1st Cir. 2004). The case was dismissed, on jurisdictional grounds. However, after exhausting interlocutory relief through the Puerto Rico courts, Esso filed a renewed motion for preliminary injunction in the district court, which was granted. Esso Standard Oil Co. v. López-Freytes, Case No. 03-2319 (D.P.R. Mar. 11, 2005). The order required the EQB to immediately suspend all administrative hearings and proceedings against Esso related to the penalty provision of the order to show cause. It also enjoined the EQB from conducting hearings pursuant to the order, from issuing any judgments or resolutions, final or interlocutory, in the La Vega matter, and from instituting, conducting and/or prosecuting any administrative penalty proceedings against Esso based on or arising from those facts. The injunction became permanent in November 2006. Esso Standard Oil Co. v. López-Freytes, 467 F.Supp.2d 156 (D.P.R. Nov. 7, 2006) (order granting summary judgment and permanent injunction), aff'd, 522 F.3d 136 (1st Cir. 2008).

On April 18, 2006, Esso began drilling holes in the ground of the former service station at La Vega as part of its remediation activities. As a consequence, gasoline odors escaped from the site and several plaintiffs, including children, had to visit regional medical centers and hospitals for the

1   treatment of dizzyness, nausea, shortness of breath, and headaches.  Plaintiffs experts contend that

2   dozens of La Vega residents are suffering respiratory, dermatological, and neuropsychological

3   illnesses due to the presence of toxins at the service station and in the surrounding areas.  These

4   conditions, argue Plaintiffs, either developed as a result of the toxins present at the service station

5   or have been aggravated by the same.  Esso's experts, on the other hand, hold that exposure to the

6   chemicals associated with former operations at the service station do not pose an appreciable risk

7   of adverse health effects for people living near the site.  They also state that the proposed

8   remediation plan can be conducted without causing adverse health effects in the community.

9       Several plaintiffs intervened in the EQB proceedings against Esso in May 2000, but later

10  withdrew their intervention.  On May 2, 2003 the original complaint in this case was filed (Docket

11  No. 1), nearly one year after plaintiffs had sent notice to Esso, the EQB, and other interested parties

12  of their intent to commence a civil action against Esso under the federal pollution statutes.  Plaintiffs

13  charge Esso with violations under CWA, RCRA and CERCLA, as well as violations to Puerto Rico

14  nuissance and tort laws, claiming environmental damage as a result of the contamination and

15  damages to their health and property.  They seek declaratory and injunctive relief requiring Esso to

16  fully comply with the local and federal regulatory clean-up requirements, the imposition of civil

17  penalties for non-compliance with both state and federal environmental statutes, and the payment

18  of costs and attorney's fees. On November 10, 2008, after a plethora of procedural events, defendant

19  Esso filed a motion for summary judgment (Docket No. 905).  Plaintiffs opposed Esso's  motion

20  (Docket No. 938), Esso replied (Docket No. 954), and plaintiffs sur-replied (Docket No. 962).

21  **III.    Discussion**

22      Esso moves for summary judgment on various grounds: (a) the EQB's proceedings against

23  Esso bar plaintiffs' claims brought under the citizen suit provisions of the CWA and the RCRA; (b)

24  the RCRA claims are barred by the the applicability of the CWA; (c) the RCRA citizen suit

25  enforcement action is barred by the doctrine of reverse preemption; (d) the mere presence of

26  contamination at the site does not establish an ongoing violation, as required to establish a claim

27  under the RCRA, the CWA, and CERCLA; (e) failure to show a reasonable prospect of serious

28  threat to human health or the environment, as required to establish a claim under the RCRA

1  imminent and substantial endangerment statute; (f) plaintiffs' claim does not identify the effluent

2  standard that Esso is allegedly violating under the CWA; and (g) the CERCLA petroleum exclusion

3  is applicable.  The court addresses each averment separately.

4     **A.    Effect of the EQB's Proceedings on Plaintiffs' Citizen Suits Under CWA and**

5         **RCRA**

6        *(i)    Effect of the EQB Proceedings Upon the CWA Citizen's Suit*

7        Section 505 of the Clean Water Act states that, "[e]xcept as provided in [. . .] section

8  1319(g)(6) of this title, any citizen may commence a civil action on his own behalf– (1) against any

9  person [. . .] who is alleged to be in violation of (A) an effluent standard or limitation under this

10  chapter or (B) an order issued by the Administrator [of the Environmental Protection Agency

11  ("EPA")] or a State with respect to such a standard or limitation [. . .]" 33 U.S.C.A. § 1365(a).  In

12  turn, section 1319(g)(6) of title 33, which corresponds to section 309(g)(6) of the CWA, provides

13  that "any violation-- [. . .] (ii) with respect to which a State has commenced and is diligently

14  prosecuting an action under a State law comparable to this subsection, [. . .] shall not be the subject

15  of a civil penalty action under [. . .] section 1365 of this title." 33 U.S.C.A. § 1319(g)(6)(A).  Since

16  plaintiffs' claims are based on the same discharge violations as the EQB's orders under state law,

17  they are barred by section 309(g)(6) of the CWA if it is determined that the state is "diligently

18  prosecuting" its action under "comparable" state law.  See North and South Rivers Watershed Ass'n,

19  Inc. v. Town of Scituate, 949 F.2d 552, 558 (1st Cir. 1991).

20        Defendants contend that plaintiffs' RCRA lawsuit, filed in May 2003, is a collateral attack

21  on EQB's strategy for addressing the petroleum contamination in La Vega, outlined in the four

22  administrative orders issued in 1998, 1999, and 2001.  Plaintiffs argue that their claim is not barred

23  because the administrative procedures followed by the EQB are not comparable to their civil action.

24  This is because plaintiffs seek (and the court may impose) significant civil penalties on Esso arising

25  from its violations of the CWA, yet the Court of Appeals for the First Circuit has permanently

26  enjoined the EQB from seeking civil penalties against Esso for the events related to the La Vega

27  service station spill.  It is undisputed that in Esso Standard Oil Co. v. López-Freytes, 522 F.3d 136

28  (1st Cir. 2008) the First Circuit affirmed the district court's ruling permanently enjoining several

1   members and officials of the EQB from imposing a $76 million fine on Esso, proposed in a May 21,

2   2001 order to show cause.  The permanent injunction also enjoined the defendants from "instituting,

3   conducting and/or prosecuting any administrative penalty proceedings against Esso based on or

4   arising from the facts and events described in said order to show cause." López-Freytes, 522 F.3d

5   at 149.  In North and South Rivers, 949 F.2d at 555, the First Circuit held that "[t]he bar against

6   citizen's civil penalty suits only operates where the State has brought an action comparable to

7   subsection 309(g)."  In determining whether an administrative order, issued under Massachussetts's

8   clean water provisions by the state's Department of Environmental Protection, could preclude a

9   citizen's suit under the CWA, the First Circuit stated "[i]t is enough that the Massachusetts statutory

10  scheme, under which the State is diligently proceeding, contains penalty assessment provisions

11  comparable to the Federal Act, *that the State is authorized to assess those penalties*, and that the

12  overall scheme of the two acts is aimed at correcting the same violations, thereby achieving the same

13  goals." North and South Rivers, 949 F.2d at 556 (emphasis added).

14          In light of the holding in López-Freytes, it cannot be said that in the instant case the EQB "is

15  authorized to assess" the comparable penalty provisions contained in the applicable Puerto Rico

16  statute.  See P.R. Laws Ann. tit. 12, § 1136.  Thus, the court must conclude that plaintiffs' claim

17  under section 505 of the CWA is not barred by the EQB's administrative proceedings.  Moreover,

18  the First Circuit's ruling in López-Freytes, affirming the district court's permanent injunction against

19  the EQB for apparent bias and inability to afford Esso its due process rights, at the very least creates

20  very serious doubt as to the EQB's capacity to fairly adjudicate matters related to the La Vega spill.

21  Therefore, Defendant Esso's motion for summary judgment on this basis is denied.

22          *(ii)   Effect of the EQB Proceedings Upon the RCRA Citizen's Suits*

23          Similar to the CWA, the RCRA also has a citizen suit provision.  Section 7002 of the  RCRA

24  states:

25          Except as provided in subsection (b) or (c) of this section, any person may commence
        a civil action on his own behalf–

26

27          (1)(A) against any person [. . .] who is alleged to be in violation of any permit,
        standard, regulation, condition, requirement, prohibition, or order which has become
        effective pursuant to this chapter; or

28

(B) against any person, [. . .] and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; [. . .]

42 U.S.C.A. § 6972(a). Subsection (b), in turn, states certain conditions under which a Section 7002 RCRA citizen's suit is precluded. Regarding an action under subsection (a)(1)(A), otherwise known as a citizen's enforcement action, the RCRA provides that no action may be commenced by a private litigant "if the Administrator [of the EPA] or State has commenced and is diligently prosecuting *a civil or criminal action in a court of the United States or a State* to require compliance." 42 U.S.C.A. § 6972(b)(1)(B) (emphasis added). Likewise, actions under subsection (a)(1)(B) for an imminent and substantial endangerment are barred "if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment-- (i) has commenced and is diligently prosecuting *an action* under subsection (a)(1)(B) of this section; (ii) is actually engaging in a removal action under section 104 of the [CERCLA] [42 U.S.C.A. § 9604]; or (iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the [CERCLA] [42 U.S.C.A. § 9604] and is diligently proceeding with a remedial action under that Act [42 U.S.C.A. § 9601 et seq.]." 42 U.S.C.A. § 6972(b)(2)(C) (emphasis added).

Defendant Esso contends that, as regards the imminent and substantial endangerment claim, dismissal is required pursuant to 42 U.S.C. § 6972(b)(2)(C)(i) because the word "action" as used in the RCRA statute does not connote a legal action in a court of law, but merely activities by the state to require remediation. Esso argues that the omission of the words "in a court" from this subsection, as opposed to subsection (b)(1)(B), shows that Congress decided to allow a more relaxed preclusionary rule for imminent hazard claims. The court is not persuaded by this argument. Under the clear language of 42 U.S.C. § 6972(b)(1)(B), the only state action capable of precluding a citizen suit under subsection (a)(1)(A) is a "civil or criminal action in a court." This language does not afford any preclusive effect to a state administrative action. Although claims brought under subsection (a)(1)(B) are admittedly governed by less straightfoward preclusionary language, most

courts that have analyzed 42 U.S.C. § 6972(b)(2)(C)(i) have held as a matter of course that state administrative "actions" are not covered by its terms.  See Kara Holding Corp. v. Getty Petroleum Marketing, Inc., 67 F. Supp. 2d 302, 307 (S.D. N.Y. 1999) (citing several cases in support of this proposition).  These cases are not binding on this court.  However, since the First Circuit has not expressed itself regarding this specific issue, they are considered here for their persuasive value.  Accordingly, the court finds that the private rights of action brought by plaintiffs under RCRA's citizen suit provisions are not barred by the EQB's previous administrative actions.  Therefore, Defendant Esso's motion for summary judgment on this basis is also denied.

### B.    The RCRA Claims Are Not Barred by the CWA

In section 1004(27), the RCRA excludes from the definition of "solid waste" industrial discharges "which are point sources subject to permits under section 1342 of Title 33 [ i.e., section 402 of the CWA]...."  See 42 U.S.C. § 6903(27).  Regulations promulgated under the CWA define "point source" as "any discernible, confined, and discrete conveyance, including, but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container [. . .] from which pollutants are or may be discharged."  See 40 C.F.R. § 260.10 (1988).  While this definition does seem to encompass the leakage of gasoline from Esso's USTs into the local groundwater, defendant Esso has not established that any discharges were made pursuant to and authorized by a permit under section 402 of the CWA, 33 U.S.C. § 1342.    Thus, the court finds the exclusion contained in section 1004(27) of the RCRA to be inapplicable to this case.  See Water Keeper Alliance v. United States Department of Defense, 152 F. Supp. 2d 163, 169-70 (D.P.R. 2001) (plaintiffs' RCRA claims were dismissed only to the extent that they relied on discharges of solid waste that were covered by defendants' section 402 permit); see also Lutz v. Chromatex, Inc., 725 F. Supp. 258, 263 (M.D. Pa. 1989) (citing United States v. Allegan Metal Finishing Co., 696 F.Supp. 275, 280-281 (W.D.Mich.1988), appeal dismissed, 867 F.2d 611 (6th Cir.1989) ("It is clear that the exclusion enshrined in the definition of solid waste is for those actual discharges from point sources which are made pursuant to and authorized by a NPDES permit") (emphasis in original)).  Defendant Esso's motion for summary judgment on this basis is, therefore, also denied.

Civil No. 03-1485 (GAG)                    10

1    **C.      The RCRA Private Rights Enforcement Action is Not Barred by the Doctrine**
2           **of Reverse Preemption**

3        Defendant Esso argues that because Puerto Rico's Underground Storage Tank Control
4    Regulation ("USTCR") was approved by the EPA "in lieu of" the federal program for USTs, if there
5    is a violation of the Puerto Rico USTCR, it is a matter of state law that cannot be enforced through
6    the RCRA.  The court disagrees.  The 1990 Puerto Rico USTCR was enacted by the EQB following
7    the letter and spirit of the federal regulation published in 40 C.F.R. Part 280.  To coordinate the
8    federal/state efforts of protecting the public health and the environment, in March of 1997 the
9    government of Puerto Rico and the EPA entered into a Memorandum of Agreement setting forth the
10   roles, policies, responsibilities, and procedures for the sound management of the program by the
11   EPA Region II and the EQB with respect to the USTCP for the Commonwealth of Puerto Rico.  This
12   was done pursuant to section 9004 of RCRA, 42 U.S.C. § 6991(c), as amended.  Though the
13   government of Puerto Rico, through the EQB, assumed primary responsibility for the
14   implementation of the RCRA Underground Storage Tank Control Program within the territorial
15   boundaries of Puerto Rico, the EPA retained authority to make certain that the law and regulation
16   would be followed, including direct federal implementation in the event that Puerto Rico was unable
17   or failed to act.  See Sanchez v. Esso Standard Oil de Puerto Rico, Inc., Civil No. 08-2151, slip op.
18   (D.P.R. December 5, 2008).

19       As plaintiffs point out, the EPA itself takes the position that an RCRA citizen suit may be
20   brought after a state has received authorization to operate its program in lieu of the federal program:
21   "[u]nder RCRA, Section 7002, any person may commence a civil action on his own behalf against
22   any government instrumentality or any person who is alleged to be in violation of permits,
23   regulations, conditions, etc. [. . .]  As a result, any person, whether in an authorized or unauthorized
24   State, may sue to enforce compliance with statutory and regulatory standards."  Lutz v. Chromatex,
25   Inc., 725 F.Supp. 258, 261 (M.D. Pa. 1989) (quoting 45 Fed.Reg. 85016 (Dec. 24, 1980) (emphasis
26   added); citing also 49 Fed.Reg. 48300 (Dec. 12, 1984)); see also Sierra Club v. Chemical Handling
27   Corp., 824 F.Supp. 195, 197 (D. Colo.1993) (holding that because Colorado's hazardous waste
28   program was authorized by RCRA, it  became effective pursuant to RCRA, and the citizen suit

provision of section 6972(a)(1)(A) applies); <u>Murray v. Bath Iron Works Corp.</u>, 867 F.Supp. 33, 43

(D. Me. 1994) (same); <u>College Park Holdings, LLC. v. Racetrac Petroleum, Inc.</u>, 239 F.Supp.2d

1334, 1346 (N.D. Ga. 2002) (holding, as a mater of course, that  Georgia's EPA-approved UST

program is enforceable by a RCRA citizen suit).   Courts generally show great deference to the

interpretation of applicable statutes and regulations given by the agency charged with the

administration of a particular program, when such interpretations are reasonable and consistent with

such statutes and regulations.   <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 413-14 (1945).

What is more, the citizen suit provision of the RCRA states as follows:

> Any action under paragraph (a)(1) of this subsection *shall be brought in the district court* for the district in which the  alleged violation occurred  or the alleged endangerment may occur [. . .] *The district court shall have jurisdiction*, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

42 U.S.C. § 6972(a) (emphasis added).  As pointed out by plaintiffs, other courts have interpreted

that through this disposition the RCRA places exclusive jurisdiction in federal courts for suits

brought pursuant to section 6972(a)(1).  <u>See, e.g.</u>, <u>Blue Legs v. U.S. Bureau of Indian Affairs</u>, 867

F.2d 1094, 1098 (8th Cir. 1989).  Given the statute's plain language, this court is persuaded by this

interpretation and finds that plaintiffs' RCRA private rights enforcement action for violations of

Puerto Rico's USTCR is properly before the court's jurisdiction.  Defendant's motion for summary

judgment on this basis is, therefore, denied.

### D.    The Ongoing Violation Requirement for Citizen's Suits Under RCRA, CWA, and CERCLA

*(i)    RCRA Enforcement Claim and the Ongoing Violation Requirement*

Defendant Esso next argues that plaintiffs' RCRA citizen suit claim under 42 U.S.C. §

6972(a)(1)(A) must be dismissed because it is based upon alleged wholly past violations.  Esso

argues that if it failed to fully investigate, report, and remediate the La Vega site back in 1990 or

Civil No. 03-1485 (GAG)                    12

1    1991, when it first "learned" of the contamination, these are past violations under subsection

2    6972(a)(1)(A) of RCRA and cannot be prosecuted.      In support of this argument, Esso cites Gwaltney

3    of Smithfield, LTD. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 57 & n.2 (1987) and cases

4    interpreting its holding.  In Gwaltney, the Supreme Court held that citizens' suits could not be

5    maintained under the Clean Water Act for alleged wholly past violations of the Act.  In construing

6    the citizen's suit provision in the CWA, the Gwaltney court concluded:

7            The most natural reading of "to be in violation" is a requirement that citizen-
             plaintiffs allege a state of either continuous or intermittent violation-that is, a
8            reasonable likelihood that a past polluter will continue to pollute in the future.
             Congress could have phrased its requirement in language that looked to the past ("to
9            have violated"), but it did not choose this readily available option.

10   Id. at 57.  In support of this conclusion, the Supreme Court noted that: (1) Congress used identical

11   language in the citizen's suit provision of several other environmental statutes that authorized only

12   prospective relief, see id.; (2) the pervasive use of the present tense throughout the Clean Water Act's

13   citizen suit provision indicates the prospective orientation of the provision, see id. at 58-59; and (3)

14   the legislative history of the Act indicates that citizen suits were intended to abate pollution and to

15   enjoin continuous or intermittent violations, not to remedy wholly past violations. See id. at 61-63.

16           In Gwaltney, the Supreme Court specifically mentioned RCRA as an environmental statute

17   that authorizes only prospective relief.  See Gwaltney, 484 U.S. at 57 n. 2.  Though the First Circuit

18   has not ruled on this matter, several courts have extended the Gwaltney holding[1] to RCRA's

19

20

21           [1] In analyzing the Gwaltney holding, infra, the court notes that the decision does not state that
     the bar for "wholly past violations" applies to suits brought pursuant to § 6972(a)(1)(B), RCRA's
22   imminent and substantial endangerment subsection.  Rather, § 6972(a)(1)(B) "explicitly targets
     wholly past violations." Gwaltney, 484 U.S. at 57.  The Gwaltney Court noted:
23

24           [T]he Solid Waste Disposal Act as amended in 1984 to authorize citizen suits against
             any "past or present" generator, transporter, owner, or operator of a treatment,
25           storage, or disposal facility "who has contributed or who is contributing" to the "past
             or present" handling, storage, treatment, transportation, or disposal of certain
26           hazardous waste. 42 U.S.C. § 6972(a)(1)(B) (1982 E.D., USPP. III). Prior to 1984,
             the Solid Waste Disposal Act contained language identical to that of § 501(a) of the
27           Clean Water Act, authorizing citizens' suits against any person "alleged to be in
             violation" of waste disposal permits or standards. 42 U.S.C. § 6972(a)(1).
28

1   analogous citizen's suit provision, § 6972(a)(1)(A), requiring an allegation of either a continuous or

2   intermittent violation.  See, e.g., Coburn v. Sun Chemical Corp., 1988 WL 120739 at *7-9, 28 Env't

3   Rep.Cas. 1665, 1672-73 (E.D. Pa.1988); Harris Bank Hinsdale, N.A. v. Suburban Lawn, Inc., 1992

4   WL 396295 at *2-3 (N.D. Ill. December 22, 1992); Dydio v. Hesston Corp., 887 F.Supp. 1037, 1040

5   (N.D. Ill. 1995); Raymond K. Hoxsie Real Estate Trust v. Exxon Educ. Foundation, 81 F.Supp.2d

6   359, 363 (D.R.I. 2000); College Park Holdings, 239 F.Supp.2d at 1346.  This court concurs.  Section

7   6972(a)(1)(A) of RCRA contains the same "to be in violation" language as 33 U.S.C. §

8   1365(a)(1)(A).  In addition, plaintiffs point to no legislative history or other evidence showing that

9   Congress did not wish to limit the reach of § 6972(a)(1)(A) to continuous or intermittent violations.

10      However, while this court finds that the reach of § 6972(a)(1)(A) is confined to allegations

11  of continuous or intermittent violations, it also finds that plaintiffs have raised an issue of material

12  fact as to whether or not Esso's violations are continuous.  Plaintiffs aruge that Esso has failed to

13  take corrective action in connection with petroleum contamination resulting from leaking USTs and

14  have brought forth evidence that there might be continued migration of the released contaminants.

15  While there is no jurisprudence in the First Circuit regarding this issue, several courts  have found

16  that failure to take corrective action and comply with regulations in connection to a previous spill

17  can constitute a continuous violation under § 6972(a)(1)(A).  See, e.g., Fallowfield Dev. Corp. v.

18  Strunk, 1990 WL 52745 at *10 (E.D. Pa.1990) ("If a person disposes of hazardous waste on a parcel

19  of property, the hazardous waste remains in that property insidiously infecting the soil and

20  groundwater aquifers. In other words, the violation continues until the proper disposal procedures

21  are put into effect or the hazardous waste is cleaned up."); Gache v. Town of Harrison, New York,

22  813 F.Supp. 1037, 1041 (S.D.N.Y.1993) ("[I]mproperly discharged wastes which continue to exist

23  unremediated represent a continuing violation of RCRA.");  City of Toledo v. Beazer Materials &

24  Servs., Inc., 833 F.Supp. 646, 656 (N.D.Ohio 1993) ("[T]he disposal of wastes can constitute a

25

26  Id., 484 U.S. at 57.  Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1575-
    76 (5th Cir.1988) also states that § 6972(a)(1)(B) provides for a claim for injunctive relief on either

27  past or present conduct.  Accordingly, any limitation on plaintiff's RCRA claim due to the prior
    nature of Esso's violations would apply only to § 6972(a)(1)(A), plaintiffs' enforcement action.

28  Defendant Esso concedes as much.  See Docket No. 905 at 20; Docket No. 954 at 10.

1    continuing violation so long as no proper disposal procedures are put into effect or as long as the

2    waste has not been cleaned up and the environmental effects remain remediable."); Dydio, 887

3    F.Supp. at 1040-46 (past owners of USTs have a continuing obligation to take corrective action

4    following the confirmed release of a regulated substance; regardless of the timing of the leaks,

5    defendant was violating RCRA and is liable under 42 U.S.C. § 6972(a)(1)(A) by failing to take

6    corrective action as required by the regulations); Raymond K. Hoxsie Real Estate Trust, 81

7    F.Supp.2d at 363-65 (following Dydio and determining that owner's failure to adequately remediate

8    a confirmed leak, regardless of when the leak took place, is a "current" violation of RCRA under 42

9    U.S.C. § 6972(a)(1)(A)); California v. M & P Investments,308 F.Supp.2d 1137, 1146-48 (E.D. Cal.

10   2003) (it is enough to constitute a continuous violation under RCRA that improperly discharged

11   hazardous wastes "continue to exist unremediated" at the contamination site).

12          Because plaintiffs allege present conduct on the part of Esso, this Court cannot properly

13   dismiss plaintiff's RCRA § 6972(a)(1)(A) claim on the ground that it is based on wholly past

14   violations.  Thus, Defendant Esso's motion for summary judgment on this ground is denied.

15   Plaintiffs, of course, will have to prove at trial that Esso is actually violating RCRA or its

16   regulations.

17                 *(ii)*     *CWA Citizen's Suit and the Ongoing Violation Requirement*

18          Esso further contends that a citizen's suit under the CWA is precluded by the Supreme

19   Court's decision in Gwaltney, discussed *ante*, because plaintiffs have failed to allege a continuing

20   violation.  The unanimous holding of Gwaltney was that 33 U.S.C. § 1365(a), which authorizes

21   private citizen suits for injunctive relief and/or civil penalties, does not confer federal jurisdiction

22   over citizen suits for wholly past violations.  Id. at 56-65.  The Court went on to hold, however, that

23   where citizen-plaintiffs make a "good-faith allegation of continuous or intermittent violations,"

24   federal jurisdiction will attach under 33 U.S.C. § 1365(a).  Id. at 64-65.  Citizen-plaintiffs are not

25   required to provide proof of these allegations to invoke federal court jurisdiction.  Id.  While

26   defendants may challenge the truth of plaintiffs' allegations of continuing or intermittent violations,

27   via a motion for summary judgment, the burden of proof is upon the defendants.  Id. at 66.  If

28   defendants fail to show that plaintiffs' allegations are a sham, which raise no genuine issue of fact,

1   after plaintiffs offer some evidence to support their allegations, the motion for summary judgment

2   must be denied. Id. Defendants' burden of proof is a heavy one. Defendants "must demonstrate that

3   it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

4   Id.

5         In the instant case, defendant Esso argues that plaintiffs lack any specific allegations of an

6   ongoing regulatory violation because the mere presence of contamination at the La Vega site and the

7   possibility that the contamination will continue to flow into the adjacent Piñonas River is insufficient

8   under 33 U.S.C. § 1365(a). To support its contention, Esso cites Pawtuxet Cove Marina, Inc. v.

9   Ciba-Geigy Corp., 807 F.2d 1089 (1st Cir. 1986), where the First Circuit dismissed a citizen suit

10   brought under the CWA because the alleged polluter had ceased operations by the time the suit was

11   filed. Esso also cites cases in other circuits, that support its argument. See, e.g., Hamker v.

12   Diamond Shamrock Chem. Co., 756 F.2d 392, 297 (5th Cir. 1985) (dismissing complaint because

13   it "alleges only a single past discharge with continuing effects, not a continuing discharge");

14   Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., 989 F.2d 1305, 1312-12 (2d Cir.

15   1993) ("The present violation requirement of the Act would be completely undermined if a violation

16   included the mere decomposition of pollutants."); Brewer v. Ravan, 680 F.Supp. 1176, 1183

17   (M.D.Tenn.1988) (dismissing citizen suit based on allegations made against a permanently closed

18   manufacturing plant); Friends of Santa Fe County v. LAC Minerals, Inc., 892 F.Supp. 1333, 1354

19   (D.N.M.1995) (finding no ongoing discharge from pile of waste rock on surface); Wilson v. Amoco

20   Corp., 33 F. Supp. 2d 969, 975-76 (D.Wyo. 1998) (concluding "that migration of residual

21   contamination from previous releases does not constitute an ongoing discharge"), factual background

22   stated in 989 F.Supp. 1159 (D.Wyo.1998); Aiello v. Town of Brookhaven, 136 F. Supp. 2d 81, 120

23   (E.D. N.Y. 2001) (holding CWA does not allow citizen suit against a past polluter "for the ongoing

24   migrating leachate plume").

25         This court is not so easily persuaded, however. Pawtuxet Cove, cited by defendant, is

26   distinguishable from the case at bar. In Pawtext Cove the First Circuit decided that, because

27   defendant had ceased operations under its permit at the time plaintiffs brought suit, there was no

28   reasonable likelihood that the alleged infractions would continue. The case did not involve the

1   allegation that migration, decomposition, and diffusion of pollutants into a waterway was sufficient

2   to sustain a CWA citizen's suit, as in the present action.  Here, plaintiffs rely on the theory that Esso

3   is unlikely to adequately comply with previous orders issued by the EQB requiring Esso to remediate

4   and contain the contamination present at the La Vega site.  The fact that the Esso station at La Vega

5   ceased its operations in 1998 does not change the prospective nature of plaintiffs' suit at the time it

6   was brought.  Moreover, in <u>Pawtuxet</u> the Court stated that it did not agree "with the reasoning which,

7   apparently, led the Lousiana district court, following the <u>Hamker</u> decision, to dismiss a number of

8   actions simply because no violations occurred on the dates the complaints were filed.  A plaintiff

9   who makes allegations warranting injunctive relief in good faith, judged objectively, may recover

10  a penalty judgment for past violations even if the injunction proves unatainable."  <u>Pawtuxet</u>, 807

11  F.2d at 1094 (citing <u>Sierra Club v. Copolymer Rubber & Chemical Corp.</u>, 621 F. Supp. 1013, 1015

12  (M.D. La. 1985).  Thus, it cannot be said that the First Circuit has adopted a restrictive interpretation

13  of the CWA citizen's suit provision.  Furthermore, other courts have interpreted the CWA and

14  <u>Gwaltney</u> expansively, holding that the continuing migration of pollutants from past discharges is

15  sufficient to establish jurisdiction under 33 U.S.C. § 1365(a).  <u>See</u> <u>North Carolina Wildlife Fed'n v.</u>

16  <u>Woodbury</u>, 1989 WL 106517 at *2 (E.D. N.C.1989) (finding "it is not the physical act of discharging

17  dredge wastes itself that leads to the injury giving rise to citizen standing, but the consequences of

18  the discharge in terms of the lasting environmental degradation."); <u>Werlein v. United States</u>, 746 F.

19  Supp. 887, 897 (D. Minn.1990) (holding pollutants from past discharges that are released over time

20  by infiltration of contaminated soil is "ongoing pollution"), <u>class. cert. vacated by</u> 793 F.Supp. 898

21  (D. Minn. 1992); <u>Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc.</u>, 962 F.Supp.

22  1312, 1322 (D. Or. 1997) (holding "a discharge of pollutants is ongoing if the pollutants continue

23  to reach navigable waters, even if the discharger is no longer adding pollutants to the point source

24  itself").

25         Accordingly, the court concludes as reasonable plaintiffs' argument that the failure by Esso

26  to take remedial measures should be treated as a continuing violation, since it is not the physical act

27  of discharging toxic materials that gives rise to citizen standing under the CWA, but the

28  consequences of the discharge in terms of lasting environmental damage and adverse health effects

on the population.  See North Carolina Wildlife Fed'n, 1989 WL 106517 at *2-3 (adopting this

argument).  This position finds support in Justice Scalia's concurrence in Gwaltney, in which he was

joined by Justices Stevens and O'Connor.  According to the concurring Justices, the phrase in 33

U.S.C. § 1365(a)  "to be in violation," unlike the phrase "to be violating" or "to have committed a

violation," suggests "a state rather than an act-the opposite of a state of compliance.  A good or lucky

day is not a state of compliance.  Nor is the dubious state in which a past effluent problem is not

recurring at the moment but the cause of that problem has not been completely and clearly

eradicated.  When a company has violated an effluent standard or limitation, it remains for purposes

of [§ 1365(a)] 'in violation' of that standard or limitation so long as it has not put in place remedial

measures that clearly eliminate the cause of the violation."  Gwaltney, 484 U.S. at 69.  Because the

hazardous waste involved in this action remains a remediable threat to the environment and the

health of the population at La Vega, this court is inclined to allow the citizen suit under 33 U.S.C.

§ 1365(a) to proceed.  Therefore, defendant's motion for summary judgment on this ground is

denied.

(iii)    CERCLA Citizen's Suit and the Ongoing Violation Requirement

In 1980, Congress passed the Comprehensive Environmental Response, Compensation, and

Liability Act, 42 U.S.C. §§ 9601-9675.  Under the Act, persons who are responsible for the release

of hazardous substances may be liable for the costs of removing or remedying the contamination,

the costs associated with damage to natural resources, and the costs to human health.  See id. §

9607(a); see also Dravo Corp. v. Zuber, 13 F.3d 1222, 1225 (8th Cir.1994).  A private citizen may

bring a CERCLA action under  42 U.S.C.A. § 9659(a)(1) "against any person [. . .] who is alleged

to be in violation of any standard, regulation, condition, requirement, or order which has become

effective pursuant to this chapter [. . .]."  Though the First Circuit has not ruled on this matter,

several courts have extended the Gwaltney holding, discussed ante, to CERCLA's analogous

citizen's suit provision, requiring an allegation of either a continuous or intermittent violation.  See

Lutz v. Chromatex, Inc., 718 F.Supp. 413, 420-22 (M.D. Pa. 1989) (relying on, Gwaltney to hold

that the citizens suit provision of CERCLA does not confer federal jurisdiction over actions based

on wholly past violations); Coalition for Health Concern v. LWD, Inc., 60 F.3d 1188, 1193 (6th Cir.

1   1995) (citing <u>Lutz</u> and holding that alleged failure to comply with the notice provisions of CERCLA

2   concerning the handling and release of hazardous materials into the environment is not a continuous

3   or intermittent violation).

4         Defendant argues that the continuing or intermittent violation requirement has not been met

5   by plaintiffs, for the same reasons as alleged under RCRA and CWA.  Since the First Circuit has not

6   ruled on this matter, the court adopts by analogy its interpretation of similar language in RCRA and

7   CWA, discussed *ante*, and concludes that the "in violation" requirement of § 9659(a)(1) is met here

8   because the contamination has not been remediated and plaintiffs, likewise, seek prospective relief

9   in the form of testing and cleanup activities.  This is consistent with other courts' expansive

10  interpretation of CERCLA provisions.  <u>See, e.g.</u>, <u>Nurad, Inc. v. William E. Hooper & Sons Co.</u>, 966

11  F.2d 837, 844-846 (4th Cir. 1992) (citing <u>United States v. Waste Ind., Inc.</u>, 734 F.2d 159, 164-65

12  (4th Cir. 1984)) (analogizing CERCLA dispositions to RCRA; term "disposal" in CERCLA is not

13  limited to active human conduct, but, rather, has a range of meanings, including reposing of

14  hazardous waste and its subsequent movement through the environment).  Defendant Esso's motion

15  for summary judgment on this ground is, therefore, denied.

16        **E.     Plaintiff Has Established an RCRA Imminent and Substantial Endangerment**

17                **Claim**

18        To successfully prosecute a claim under 42 U.S.C. § 6972(a)(1)(B), an RCRA plaintiff must

19  demonstrate that (1) the defendant was or is a generator or transporter of solid or hazardous waste

20  or owner or operator of a solid or hazardous waste treatment, storage, or disposal facility, (2) the

21  defendant has contributed or is contributing to the handling, storage, treatment, transportation, or

22  disposal of solid or hazardous waste, as defined by the RCRA, and (3) that the solid or hazardous

23  waste in question "may present an imminent and substantial endangerment to health or the

24  environment."  <u>See</u> 42 U.S.C. § 6972(a)(1)(B).  The First Circuit has held that the use of the word

25  "may" in this subsection of the RCRA was inteded to make the provision expansive, in order to give

26  the courts the tools to "eliminate any risks posed by toxic waste."  <u>Maine People's Alliance and</u>

27  <u>Natural Resources Defense Council v. Mallinckrodt, Inc.</u>, 471 F.3d 277, 287 (1st Cir. 2006) (quoting

28  S.Rep. no. 98-284, at 59 (1983)).  Thus, the operative word in section 6972(a)(1)(B) is "may" and

a plaintiff need not establish an incontrovertible "imminent and substantial" harm to health and the environment.  The existence of a potential harm to health and the environment is enough, when "there is a reasonable prospect that a serious, near-term threat to human health or the environment exists." Id. at 279.  Other courts have determined that passive migration at an inactive disposal site constitutes an imminent and substantial endangerment under the RCRA.  See United States v. Price, 523 F.Supp. 1055, 1071 (D.N.J.1981), aff'd, 688 F.2d 204, 214 (3rd Cir.1982) (holding that 42 U.S.C. § 6972(a) authorizes relief restraining further leaking of waste from a landfill, and noting that it also authorizes a general cleanup of even dormant waste sites if necessary to cure a present threat to public health or the environment); United States v. Conservation Chem. Co., 619 F.Supp. 162, 200 (D.Mo.1985) (disposal occurs when wastes migrate from their initial location).

Viewing the facts in the light most favorable to the plaintiffs, the court finds that a material issue of fact exists concerning whether or not the La Vega site may currently present an imminent and substantial endangerment.  Defendant Esso has presented evidence that the chemicals released at the site do not constitute such a threat, but this evidence has been controverted by plaintiffs.  Accordingly, this issue must be reserved for trial.

**F.      Plaintiffs' CWA Claim Adequately Identifies the Effluent Standard That Esso is Allegedly Violating**

Defendant argues that plaintiff's claim does not identify the effluent standard or limitation that Esso is allegedly violating under CWA.  The CWA provides that a civil action may be brought against anyone "alleged to be in violation of [. . .] an effluent standard or limitation of this chapter." See 33 USC 1365(a)(1).  Effluent standard or limitation is defined as an "an unlawful act under subsection (a) of section 1311 of this title." See 33 U.S.C. §1365(f)(1).  In turn, 33 U.S.C. § 1311(a) provides that "the discharge of any pollutant by any person shall be unlawful."  The term "the discharge of any pollutant" is defined as the "addition of any pollutant to navigable waters from a point source," 33 U.S.C. § 1362(12), while "navigable waters" is defined as "the waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7).  Congress intended the latter term to be given "the broadest constitutional interpretation." United States v. Rivera Torres, 826 F.2d 151, 154 (1st Cir. 1987) (quoting Conference Report on Section 2770, reprinted in 1 A Legislative History

of the Water Pollution Control Act Amendments of 1972, at 178) (holding that wetlands adjacent to navigable waters are included in the term "territorial waters").  Yet, it is unclear whether or not a river located in the interior of the island constitutes water in the territorial seas.  See United States v. Appalachian Electric Power Co., 311 U.S. 377 (1941) (a body of water is "a navigable water of the United States" if (1) it presently, or (2) has been or was in the past, or (3) could be made in the future by reasonable improvements, susceptible for use in interstate or foreign commerce.), but see Natural Resources Defense Council, Inc. v. Callaway, 392 F.Supp. 685, 686 (D.C. D.C. 1975) (holding that, as used in the CWA, the term "waters of the United States" is not limited to the traditional tests of navigability); Rivera Torres, 826 F.2d at 154-55 (citing several cases in support of assertion that "the CWA has been consistently applied by the courts to land and waters located in Puerto Rico"); Commonwealth of Puerto Rico v. Alexander, 438 F.Supp. 90, 94-96 (D.C. D.C. 1977) (holding that the Federal Water Pollution Control Act Amendments of 1972 and certain regulations promulgated thereunder are applicable to nonnavigable waters of Puerto Rico, despite contention that such waters are areas of purely local concern and that federal regulation of such areas is inapplicable under the Puerto Rican Federal Relations Act).

Plaintiffs' claim alleges that an indivisible plume of contaminants attributable to Rodríguez and Esso is flowing and discharging into the Piñonas Rivera from the Esso service station at La Vega and that, until the contamination is fully remediated, the discharge will continue.  The court finds that, at a minimum, there is an issue of material fact as to whether the Piñonas River is navigable or not.  Therefore, the court cannot enter summary judgment at this time and defendant Esso's motion on this basis is denied.

**G.     Applicability of the CERCLA Petroleum Exclusion**

Esso next argues that plaintiffs' CERCLA claim must be dismissed because the substance that leaked out of their USTs fall within CERCLA's petroleum exclusion, which states, in part: "The term ['hazardous substances'] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F)[. . .]." 42 U.S.C. § 9601(14).  A petroleum product may be exempted from CERCLA "'even though certain of its indigenous components and certain additives [added]

during the refining process have themselves been designated as hazardous substances within the meaning of CERCLA.'" Cose v. Getty Oil Co., 4 F.3d 700, 704 (9th Cir.1993) (emphasis omitted) (quoting Wilshire Westwood Assocs. v. Atlantic Richfield Corp., 881 F.2d 801, 810 (9th Cir.1989)). However, "hazardous substances which are added to petroleum or which increase in concentration solely as a result of contamination of the petroleum during use are not part of the 'petroleum' and thus are not excluded from CERCLA." Southern Pacific Transp. Co. v. California, 790 F.Supp. 983, 986 (C.D.Cal.1991) (quoting EPA General Counsel, Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(a)(2) 5 (July 31, 1987); see also Cose, 4 F.3d at 704 (citing 50 Fed.Reg. 13,460 (Apr. 4, 1985));   United States v. Alcan Aluminum Corp., 964 F.2d 252, 266 (3d Cir.1992);   United States v. Amtreco, Inc., 846 F.Supp. 1578, 1584-85 (M.D.Ga.1994).

Here, it is alleged by plaintiffs that because the petroleum product was released from corroded steel USTs, it consitutes hazardous waste that falls outside of the petroleum exclusion. Alternatively, plaintiffs contend that the petroleum products that leaked out of the USTs owned by Esso mixed and commingled with the hazardous substances and waste released, stored and discharged by co-defendant Rodríguez during the operation of the station, which included used oil. Plaintiffs contention is that the petroleum exclusion ceased to apply when Esso's non-hazardous petroleum plume and Rodríguez's hazardous substances and waste commingled.  Because liability under environmental statues is, generally speaking, joint and several, plaintiffs argue Esso should be held liable "for the totality of the damage where, as here, the harm is indivisible." Maine People's Alliance, 471 F. 3d at 298.  Esso refutes this contention by arguing that joint and several liability is not a mechanism for imposing liability where it would not otherwise exist and asserts that Rodríguez is the party liable for discarding the hazardous wastes (batteries, oil fitlers, and used oil), which mixed with the petroleum in the soil and groundwater to create the indivisible plume of contaminants.  Since it is undisputed that the product discarded by Esso was the refined petroleum contained in the damaged USTs, as discrete from any other hazardous substances discarded by the operators of the Esso service station at La Vega, the petroleum exclusion applies and it cannot be considered liable under CERCLA.

The court first holds that plaintiff's alternative argument -that the commingled nature of the

contaminants makes the petroleum exclusion inapplicable- is without merit, given that the source of Esso's potential liability is undisputedly separate from co-defendant Rodríguez's.[2]  However, after reviewing the relevant facts and the case law presented by each party in their respective motions, the court concludes that an issue of material fact exists as to whether or not the petroleum released from Esso's corroded UST's contained corrosion products from the oxidation of steel in the tank walls. As pointed out by defendant Esso, United States v. Western Processing Co., Inc., 761 F. Supp. 713 (W.D. Wash 1991), held that tank bottom sludge was covered by CERCLA because it contained "a rust-like scale of corrosion products from the oxidation of steel in the tank walls," which are "hazardous substances not normally found in refined petroleum fractions." Id. at 717.  Though the present case does not deal with tank bottom *sludge*, it has been held that, where plaintiff proves that a release of a hazardous substance is *threatened*, defendant then has the burden of showing the petroleum exclusion applies.  See Jonshon v. James Langley Operating Company, Inc., 226 F.3d 957, 963, n.3 & n.4 (8th Cir. 2000) (joining the Tenth Circuit's conclusion that "once plaintiffs have presented evidence to support their allegation of a release or threatened release, defendants bear the burden of showing the petroleum exclusion applies," and noting that threatened releases have been found to include a defendant's mere ownership of "corroding and deteriorating tanks," and); Tosco Corp. v. Koch Indus., Inc., 216 F.3d 886, 896-97 (10th Cir.2000); see also United States v. First City Nat'l Bank, 386 U.S. 361, 366 (1967) (noting general rule that party claiming benefit of exception to statutory prohibition bears burden of proof).  In the present case Esso has not presented evidence to support its contention that the petroleum exclusion applies, given the undisputed fact that the petroleum it admits to releasing was contained in corroded steel USTs.  This represents a threat that the substance released by Esso was hazardous under CERCLA and requires that Esso produce evidence to prove otherwise.  Therefore, Esso's motion for summary judgment on this ground is denied.

---

[2] The court also rejects plaintiff's argument that Esso is judicially estopped from relying on the petroleum exclusion because of statements made in its CERCLA case against Rodríguez, Civil Case No. 01-2012.  This argument was previously briefed by the parties to this case and dismissed by the court.  See Docket Nos. 319, 331, 337.

**Civil No. 03-1485 (GAG)**                    23

**IV.     Conclusion**

     For the reasons discussed above, the court DENIES Esso's motion for summary judgment (Docket No. 905).

     **SO ORDERED**.

     In San Juan, Puerto Rico this 10th day of February, 2009.


*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ
United States District Judge